# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ROCHESTER DRUG CO-OPERATIVE and DAKOTA DRUG, INC., | Case No. 22-MC-0007 (ECT/JFD) |
| Plaintiffs, | |
| v. | |
| MYLAN INC.; MYLAN SPECIALITY L.P.; CVS HEALTH CORPORATION; CAREMARK PCS HEALTH, L.L.C.; CAREMARK L.L.C.; CVS CAREMARK PART D SERVICES LLC; CAREMARK RX, L.L.C.; CAREMARKPCS HEALTH LLC; EXPRESS SCRIPTS HOLDING COMPANY; EXPRESS SCRIPTS INC.; MEDCO HEALTH SOLUTIONS INC.; UNITED HEALTH GROUP INCORPORATED; UNITED HEALTHCARE SERVICES, INC.; OPTUM INC.; OPTUMRXHOLDINGS, L.L.C.; and OPTUM RX INC., | **ORDER ON PLAINTIFFS' MOTION TO COMPEL NONPARTY AMNEAL PHARMACEUTICALS LLC TO PRODUCE DOCUMENTS** |
| Defendants, | |
| AMNEAL PHARMACEUTICALS LLC, | |
| Respondent. | |

This matter is before the Court on Plaintiffs Rochester Drug Co-Operative and Dakota Drug, Inc.'s Motion to Compel Nonparty Amneal Pharmaceuticals LLC ("Amneal") to Produce Documents Responsive to a Rule 45 Subpoena. (Dkt. No. 1.) The Court held a motion hearing on February 23, 2022. (Hr'g Mins. at 1, Dkt. No. 29.) Stuart Des Roches, Noah Silverman, and Dan Chiorean represented Plaintiffs, and Bryan Pratt,

Elliott Davis, and Keiko Sugisaka represented Respondent Amneal. (*Id.*) Plaintiffs ask this Court to order Amneal to fully produce documents responsive to three Requests For Production ("RFP") sought in Plaintiffs' Subpoena of Amneal—RFP Nos. 3–5—within 45 days. (*Id.* at 5–6.) Respondent asks the Court to deny Plaintiffs' Motion because RFP Nos. 3–5 seek information that is both irrelevant and unduly burdensome to produce, and because such productions would expose Amneal's commercially sensitive strategies to its competitors or negotiating partners without affording it any legal protections for that information. (Resp't's Mem. Opp'n at 3–4, Dkt. No. 14.) Amneal also argues that the Court should both shift any ordered future production costs and fees to Plaintiffs, and also award it the costs and fees of responding to the Subpoena generally, and to this Motion to Compel particularly. (*Id.* at 4.) The Court orders the production of only that information which is both relevant and proportional, with due consideration given to Amneal's nonparty status. Therefore, Plaintiffs' Motion is granted in part and denied in part, as set forth below.

## I.   BACKGROUND

This case is a small spinoff from a larger action, *In re: EpiPen Direct Purchaser Litigation*, Case No. 20-CV-0827 (ECT/JFD) (D. Minn.) ("*In re EpiPen*"). Plaintiffs filed the operative First Amended Consolidated Class Action Complaint in that parent action on October 20, 2021. (Am. Compl., *In re EpiPen* (D. Minn. Oct. 20, 2021), Dkt. No. 271.) *In re EpiPen* is a case about the price of EpiPens, an Epinephrine-Auto-Injector ("EAI") that can be used to inject a life-saving dose of epinephrine into a person having a severe, allergic reaction. (*See* Pls.' Mem. Supp. at 8, Dkt. No. 1.) Plaintiffs allege, on behalf of a proposed class of pharmaceutical wholesalers, that Defendants Mylan Inc. and Mylan Specialty L.P.

(collectively "Mylan") paid bribes and kickbacks to three Defendant groups of pharmacy benefit managers or "PBMs"—companies that administer prescription benefit plans for insurance companies and health care plans. In exchange, the PBM Defendants gave Mylan's EpiPen favorable placement in the formularies (a list of drugs and devices covered by a health insurance company) that the PBM Defendants prepared for their clients. (*See* Pls.' Mot. Transfer Case at 4–5, Dkt. No. 5.) Plaintiffs claim that Mylan and the PBM Defendants violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) (an Act that provides a civil cause of action to challenge racketeering activity, defined as conduct in which defendants operate an enterprise through an organized, illegal scheme), when they perpetrated this commercial bribery scheme, and that Mylan also violated Section Two of the Sherman Act, 15 U.S.C. § 2 (an Act that provides a civil cause of action to challenge entities who achieve a monopoly position in a market by unlawful means), because Mylan gained a monopoly position in the EAI market through commercial bribery, rather than legitimately. (Am. Compl. ¶¶ 156–285, *In re EpiPen*.) Plaintiffs allege that, because the PBMs have power to confer market share on favored products, and because Mylan bribed the PBM Defendants to favor the EpiPen, Mylan could raise the price of EpiPens without risking its dominant position in the EAI market. (*Id.* ¶¶ 1–10.) And in fact, even though the EpiPen was more expensive than competing EAIs, allege Plaintiffs, EpiPen had a 98% share of the EAI market,[1] with sales of EpiPens exceeding one billion dollars per year.

---

[1] The Court is summarizing Plaintiffs' claims, and not taking any position on whether EAIs constitute an antitrust product market. That remains an open issue in this litigation.

Amneal manufactures and markets the Adrenaclick AG, an EAI device that competes with the EpiPen. Plaintiffs' Subpoena to Amneal seeks responsive materials to RFP Nos. 3–5, as narrowed through the parties' meet-and-confers. RFP No. 3 requests:

> Documents and communications in the Relevant Time Period relating to Amneal's views about (1) pricing strategies for Amneal's EAI Drug Device; (2) the impact of changing price on formulary placement, coverage, sales, revenue, and profits, and PBMs' correlating actual or potential reactions; (3) Amneal's ability to manufacture its EAI Drug Device and supply the market; and (4) strategies for achieving formulary placement for Amneal's EAI Drug Device[.]

(Pls.' Mem. Supp. at 7; Resp't's Mem. Opp'n at 5 (citing Pls.' Mem. Supp. at 7).) RFP Nos. 4–5 request:

> Any agreements, offers, or negotiations with the PBM Defendants in this case or their related entities (i.e. Express Scripts, OptumRx, Caremark, CVS and any corporate parents or affiliates)[.]

(*Id.*) As narrowed, the "Relevant Time Period" for these three requests is between March 1, 2012 through December 31, 2018. (Pls.' Mem. Supp. at 7 n.9; Resp't's Mem. Opp'n at 6 (citing Pls.' Mem. Supp.).) Plaintiffs have also offered to further limit this period to between January 1, 2013 through December 31, 2018. (Pls.' Jan. 21 Letter at 2 (emailed to chambers).)

The parties in the *In re EpiPen* parent action have been in discovery since March of 2021. (*See* Pretrial Sched. Order at 6, *In re EpiPen* (D. Minn. March 23, 2021), Dkt. No. 150.) Fact discovery is scheduled to close on October 1, 2022. (*See* First Am. Pretrial Sched. Order at 1, *In re EpiPen* (D. Minn. February 1, 2022), Dkt. No. 370.) As part of discovery in the *In re EpiPen* action, Plaintiffs seek evidence that could convince a jury

that Defendants' alleged commercial bribery and kickback scheme facilitated Mylan's intentionally harmful conduct, which caused antitrust injury. (Pls.' Mem. Supp. at 4.)

Accordingly, Plaintiffs' Subpoena to Amneal seeks the production of materials related to negotiations between Respondent Amneal—one of Mylan's EAI-device competitors—and the PBM Defendants named in the *In re EpiPen* parent action, in order to see whether "Defendants' schemes caused the PBM Defendants to reject or ignore lower cost competing products like Amneal's Adrenaclick AG product when they chose [the] EpiPen as the favored EAI formulary product." (Pls.' Mem. Supp. at 4.) Plaintiffs claim that, even though the Adrenaclick's price was lower than the EpiPen's during the period of the alleged bribery and kickback scheme, the price of an EpiPen rose from $219 to $609 without any apparent concern on Mylan's part for how the EpiPen's cost might cause it to lose its competitive advantage in the EAI market. (*Id.* at 9 (citations omitted); *see also* Resp't's Mem. Opp'n at 3.) Thus, according to Plaintiffs, Amneal's negotiations with the PBM Defendants are relevant to their claims in the *In re EpiPen* action. (Pls.' Mem. Supp. at 4.)

Plaintiffs argue that the relevance of RFP Nos. 3–5 is further shown by the fact that, after the commercial bribery/antitrust scheme allegedly stopped sometime in 2017 (*see* Am. Compl. ¶ 281, *In re EpiPen*), several things happened, among them that: Mylan reduced the price of EpiPens; the PBM Defendants offered better formulary placements for EAI products that compete with EpiPen; and Amneal's Adrenaclick AG product increased from a 5.9% market share to a 28% market share. (Pls.' Mem. Supp. at 9 (citations

omitted).) Plaintiffs claim that this makes Amneal[2]—as an alleged nonparty victim of the scheme between Mylan and the PBM Defendants—an appropriate recipient of information requests in *In re Epipen*. (*Id.* at 4–5, 9–10; Resp't's Mem. Opp'n at 3.)

Consequently, on April 28, 2021, Plaintiffs served on Amneal the disputed Rule 45 Subpoena *duces tecum* containing seven RFPs. (Pls.' Mem. Supp. at 10; Resp't's Mem. Opp'n at 3.) In response, on July 12, 2021, Amneal served limited productions, along with its Responses and Objections to any further productions pursuant to Federal Rule of Civil Procedure 45(d)(2)(B) (permitting such written objections to a subpoena). (Pls.' Mem. Supp. at 10; Resp't's Mem. Opp'n at 4.) Amneal generally objected on relevance grounds, asserting that information about the Adrenaclick AG was irrelevant in a case about an entirely separate product—the EpiPen—and also because Plaintiffs' request was allegedly overbroad, seeking over a decade of historical materials that would be costly and difficult for Amneal to produce. (Resp't's Mem. Opp'n at 4; Pls.' Mem. Supp. at 6.) Plaintiffs claim that in response to Amneal's objections they "significantly narrow[ed] the scope of the Subpoena[,]" prompting Amneal to produce some additional documents for which it claims a production cost of $50,000. (Pls.' Mem. Supp. at 10–11; Resp't's Mem. Opp'n at 4, 26 (citations omitted).) Meet-and-confers then took place over several months, resulting in an agreement that Amneal's productions had satisfied three of the Subpoena's RFPs, but that

---

[2] While Amneal did not own the right to distribute the Adrenaclick AG product at the time of the alleged scheme between Mylan and the PBM Defendants, its predecessors—Amedra Pharmaceuticals, LLC and Impax Laboratories—did, and Amneal is the custodian of its predecessors' historical records. (Pls.' Mem. Supp. at 9–11, 10 n.13; Resp't's Mem. Opp'n at 3.)

Amneal's responses to RFP Nos. 3–5 and 7[3] "'remain[ed] outstanding.'" (Resp't's Mem. Opp'n at 4 (citing Pls.' Ex. 9 at 1, Dkt. No. 3-9).)

After reaching this impasse in negotiations, Plaintiffs filed a Motion to Compel Amneal to produce the requested responsive materials in the U.S. District Court for the Southern District of New York ("SDNY"), the district in which Plaintiffs had served Respondent with the Subpoena. (Pls.' Mot. at 1.) When filing their Motion, Plaintiffs simultaneously requested transfer of their Motion to the District of Minnesota, pursuant to Federal Rule of Civil Procedure 45(f) (permitting such transfers), because this Court has familiarity with the related *In re: EpiPen* case. (*Id.*) The SDNY granted Plaintiffs' transfer request on December 29, 2021 without deciding Plaintiffs' Motion to Compel, which is now before this Court to decide. (Dkt. No. 11.)

In their Motion, Plaintiffs allege that, instead of fully producing the materials requested by Plaintiffs' Rule 45 Subpoena, Respondent has produced only a few documents that are either publicly available or irrelevant, and has otherwise improperly refused to produce the requested documents, claiming they are irrelevant and disproportionate. (Pls.' Mem. Supp. at 4–6, 13–14.) Amneal contends that even the narrowed versions of RFP Nos. 3–5 present a hugely burdensome fishing expedition that "seek[s] essentially every document in any way related to three different companies' various epinephrine products going back nine years[.]" (Resp't's Mem. Opp'n at 4 (citing

---

[3] Amneal claims—and Plaintiffs do not dispute—that Plaintiffs have abandoned pursuing a response to RFP No. 7, leaving only RFP Nos. 3–5 at issue in the instant Motion. (Resp't's Mem. Opp'n at 5; Pls.' Mem. Supp. at 12.)

Pls.' Ex. 10 at 2, Dkt. No. 3-10).) At oral arguments during the motion hearing, Plaintiffs

opposed Amneal's contention that their Subpoena requests—as narrowed—were overly

broad, arguing that they had sent Amneal a January 2022 letter containing a narrowed string

of search terms to be run against a modest number of custodians that was proportional to

the needs of the *In re EpiPen* case. That letter was not contained in the record at the time

of the motion hearing.

> Following the motion hearing, the Court issued the following Order:

> Following oral arguments at the motion hearing held on 2/23/2022, on
> Wednesday, 3/9/2022, Plaintiff shall provide the Court via chambers email
> with: (1) a copy of its January 2022 letter to Amneal proposing custodians to
> run search terms against, and (2) a copy of Amneal's letter in response to
> Plaintiffs' letter. If nonparty Amneal wishes to object to this ordered
> production, Amneal shall send its written objections to the Court via
> chambers email on or before Monday, 3/7/2022.

(Mar. 3 Order, Dkt. No. 31.) On March 7, Amneal provided their objections to the Court,

but instead of raising procedural objections to the Court's Order that Plaintiffs supplement

the record with the ordered production of correspondence, Amneal submitted a 20-page

response that included substantive objections to Plaintiffs' January letter, argumentation

against the broader Motion to Compel, and an exhibit of past correspondence that the Court

had not requested. (Resp't's Mar. 7 Letter (emailed to chambers).) On March 9, Plaintiffs

provided their January letter to the Court, noting that "[t]o date, Amneal has not provided

a substantive response to Plaintiffs' January Letter, nor has it objected to Plaintiffs'

submission of this letter to the Court." (Pls.' Mar. 9 Letter at 1 (emailed to chambers).)

Under the Local Rules of this District, "parties must not file a reply memorandum in

support of a nondispositive motion" unless they receive "the court's prior permission." D.

Minn. LR 7.1(b)(3). The Court ordered no such surreply from Amneal on Plaintiffs'
Motion to Compel, and declines to consider Amneal's additional substantive
argumentation that was not properly submitted by grant of this Court.

## II.      LEGAL STANDARD

Resolution of the issues in this Motion requires consideration of Federal Rules of
Civil Procedure 26 and 45.

### A.      Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26 entitles parties to liberal discovery regarding
"any nonprivileged matter that is relevant to any party's claim or defense and proportional
to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts construe the scope of Rule
26(b)(1) broadly. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing
*Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). However, "broadly" is not synonymous
with "limitless"; a party can only discover what is relevant to the actual claims or defenses
that are at issue. *See Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 252 (D. Minn. Apr.
26, 2021).

The party that seeks discovery has the burden of making a threshold showing that
the information sought is relevant to the claims or defenses in the case. *Id.* (citing *Hofer v.
Mack Trucks, Inc*., 981 F.2d 377, 380 (8th Cir. 1992)). Then, "the party resisting production
bears the burden of establishing lack of relevancy or undue burden." *Inline Packaging,
LLC v. Graphic Packaging Int'l, Inc.*, No. 15-CV-3183 (ADM/LIB), 2016 WL 6997113,
at *7 (D. Minn. Sept. 6, 2016) (citing *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*,
198 F.R.D. 508, 511 (N.D. Iowa Nov. 22, 2000)).

CASE 0:22-mc-00007-ECT-JFD   Doc. 32   Filed 05/20/22   Page 10 of 31

Beyond being relevant, Rule 26 requires that information sought in discovery also be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Factors important to a court's proportionality analysis include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

### B.    Federal Rule of Civil Procedure 45

Under Rule 45, a subpoena may command the production of "documents, electronically stored information, or tangible things" and "requires the responding person to permit inspection, copying, testing, or sampling of the materials." Fed. R. Civ. P. 45(a)(1)(D). "Pursuant to a subpoena, a non-party can be compelled to produce evidence regarding any matter relevant to the claim or defense of any party, unless a privilege applies." *Keefe v. City of Minneapolis*, No. 9-CV-2941 (DSD/SER), 2012 WL 7766299, at *3 (D. Minn. May 25, 2012) (citing Fed. R. Civ. P. 26(b)(1), 34(c)). However, "a party's ability to use a subpoena duces tecum is circumscribed by the relevance standards of Federal Rule of Civil Procedure 26(b)(1)" (which lays out the factors important to a court's proportionality analysis noted above in the previous paragraph). *Wilmas v. Renshaw*, No. 4:20-CV-01020 (SEP), 2021 WL 1546142, at *2 (E.D. Mo. Apr. 20, 2021) (quoting *Tuvalu v. Woodford*, 2006 WL 3201096, at *5 (E.D. Cal. Nov. 2, 2006)). Under Rule 26(b)(1) as applied to a nonparty Rule 45 subpoena, "discovery may not be had on matters irrelevant to the subject matter involved in the pending action," and—even where discovery is relevant—""discovery is not permitted where no need is shown, or compliance would be

unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information.'" *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999) (citing *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990) (emphasis omitted)).

Beyond the requirements of Rule 16, Rule 45 also imposes an additional layer of proportionality safeguards, which courts are directed to enforce: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena [,]" and "[t]he court for the district where compliance is required must enforce this duty and impose an appropriate sanction . . . on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1). Moreover, Rule 45 provides that a court shall quash or modify a subpoena if it "subjects a person to undue burden." Fed. R. Civ. P. 45(c). However, not every burden or expense will prompt a court to quash or modify a subpoena; some inconveniences sustained by a nonparty to comply with a subpoena will not amount to disproportionate burdens or expenses. *See Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 14-CV-4839 (SRN/KMM), 2018 WL 3019899, at *2 (D. Minn. June 18, 2018) (quoting *Honda Lease Trust v. Middlesex Mut. Assur. Co.*, No. 3:05-CV-1426 (RNC), 2008 WL 349239, at *5 (D. Conn. Feb. 6, 2008) ("'Typically, a non-party is required to absorb the costs of complying with a subpoena duces tecum. Generally, reimbursement only occurs where the costs are great or the document demand unreasonably broad.'")).

### III.    DISCUSSION

The questions before this Court are: (A) whether Plaintiffs have made the required threshold showing of relevance for RFP Nos. 3–5 (as narrowed); if yes, (B) whether Respondent has met its burden to show the information is actually irrelevant, or that the burden and expense of producing it is disproportional; (C) whether Plaintiffs have taken reasonable steps to avoid imposing undue burden or expense on Respondent while requesting this information; and (D) whether the undue burden, if any, requires this Court to quash or modify the Subpoena. The Court will take each question in turn, then will consider (E)–(F) Respondent's additional requests to be reimbursed by Plaintiffs for its past, present, and future costs related to this Subpoena and Motion.

### A.    Plaintiffs' Burden to Demonstrate Threshold Relevance

RFP Nos. 3–5, as narrowed, request materials that Plaintiffs argue are relevant to *In re EpiPen* for the same reasons. RFP No. 3 requests:

> Documents and communications in the Relevant Time Period relating to Amneal's views about (1) pricing strategies for Amneal's EAI Drug Device; (2) the impact of changing price on formulary placement, coverage, sales, revenue, and profits, and PBMs' correlating actual or potential reactions; (3) Amneal's ability to manufacture its EAI Drug Device and supply the market; and (4) strategies for achieving formulary placement for Amneal's EAI Drug Device[.]

(Pls.' Mem. Supp. at 7; Resp't's Mem. Opp'n at 5 (citing Pls.' Mem. Supp. at 7).) RFP Nos. 4–5, as narrowed and combined, request:

> Any agreements, offers, or negotiations with the PBM Defendants in this case or their related entities (i.e. Express Scripts, OptumRx, Caremark, CVS and any corporate parents or affiliates)[.]

(*Id.*) As narrowed, the "Relevant Time Period" for these three requests is between March 1, 2012 through December 31, 2018. (Pls.' Mem. Supp. at 7 n.9; Resp't's Mem. Opp'n at 6 (citing Pls.' Mem. Supp. at 7 n.9).) Plaintiffs have also offered to further limit this seven year period to six years spanning January 1, 2013 to December 31, 2018. (Pls.' Jan. 21 Letter at 2.)

Plaintiffs argue that, because the Adrenaclick and EpiPen products were and are market rivals, materials demonstrating Amneal's ability to compete or not against Mylan during the period of the alleged bribery and kickback scheme are relevant to Plaintiffs' burden to prove their allegations in *In re EpiPen* are true: that Mylan's dominance in the EAI market came from the bribes and kickbacks it paid to the PBM Defendants. (Pls.' Mem. Supp. at 16–17.) Plaintiffs allege that, to accomplish Mylan's unlawful monopoly, Mylan and the PBM Defendants conducted the affairs of "enterprises" through a pattern of racketeering activity, namely, the commercial bribery scheme by which an unlawful, symbiotic relationship developed wherein Mylan would obtain its profitable illegal monopoly because the PBM Defendants received a flow of bribes and kickbacks from Mylan. (Am. Compl. ¶ 160.) Thus, when Amneal's Adrenaclick product became an alternative to the EpiPen in approximately 2013, the fact that Amneal was a nonparticipant in this scheme made their attempts to enter the EAI market relevant to future legal challenges to Mylan and the PBM Defendants' alleged conduct. (*Id.* ¶ 45.) During the motion hearing, Plaintiffs claimed that Amneal's information is critical because there were only three major products in the EAI drug device class during the period of the alleged commercial bribery/antitrust scheme—Mylan's EpiPen, Sanofi's RBQ, and Amneal's

Adrenaclick. Plaintiffs claim that what pricing and negotiating strategies Amneal used to try to compete with Mylan in the EAI market—and how Amneal understood the PBM Defendants' responses to its attempts—is "relevant information to see what tools [the] PBMs used with market competitors." (Pls.' Mem. Supp. at 17.) Such information, Plaintiffs argue, is not only relevant, but is regularly requested of nonparties in antitrust cases, and should be produced here by Amneal. (*Id.* at 5 (citing multiple caselaw examples omitted here for brevity).) Plaintiffs also clarified at the motion hearing that they are not seeking only Amneal's internal observations about the EAI market and its ability to compete in it; they are also seeking evidence of what concrete actions Amneal and the PBM Defendants each took in relation to each other and the EAI market during the period of the alleged scheme, and evidence of whether—if Amneal had been given the opportunity to compete in the EAI market at that time—it could have manufactured and delivered the desired product supply.

The Court holds that Plaintiffs have met their threshold burden to show that some of what they seek in RFP Nos. 3–5 is relevant to their antitrust claims against Mylan and their commercial bribery claims against both Mylan and the PBM Defendants. Plaintiffs must demonstrate that all of the *In re EpiPen* Defendants violated RICO (*see* Am. Compl. ¶¶ 156–254), and conspired to violate RICO (*see id.* ¶¶ 255–62). Plaintiffs also have taken it upon themselves to show that Mylan (1) intended to control prices or destroy competition; (2) undertook predatory or anticompetitive conduct to accomplish this unlawful purpose; (3) had a dangerous probability of succeeding in their unlawful purpose; and (4) caused an antitrust injury reflecting the anticompetitive effect or made such injuries

14

possible by their anticompetitive actions. *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987); *see also Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, No. 15-CV-3443 (WMW/KMM), 437 F.Supp. 3d 693, 709 (D. Minn. Feb. 3, 2020).

If all that Plaintiffs sought was Amneal's (and its predecessors') internal thoughts about its strategies, then the Court would agree with Amneal that such information was not relevant to the elements that Plaintiffs need to prove. However, Plaintiffs also seek information about the conduct and effect of the alleged racketeering enterprises formed between Mylan and the PBM Defendants, specifically claiming that:

> [o]ne of the issues in [the *In re EpiPen*] case is whether the Defendants' schemes caused the PBM Defendants to reject or ignore lower cost competing products (such as Amneal's Adrenaclick AG product) when they chose [the] EpiPen as the favored EAI formulary product. As a result, information in Amneal's possession regarding its formulary discussions and negotiations with the PBMs, and other topics discussed below, are relevant to evaluating the Defendants' conduct and its effects.

(Pls. Mem. Supp. at 4.) The information that Amneal possesses about these enterprises and their conduct and market effect is particularly important given that Amneal is one of only three participants in the EAI market during the relevant period. How the PBM Defendants responded when presented with Amneal's pricing strategies (through proposed agreements, offers, or negotiations) to achieve formulary placement for Adrenaclick is relevant to showing the PBM Defendants' intent to conduct their businesses in accordance with the anticompetitive goals of their racketeering enterprises formed with Mylan. Thus, what Amneal proposed to the PBMs, and what Amneal observed about the PBMs' reactions, is relevant. Likewise, whether Amneal offered competitive pricing strategies over time and had the ability to supply what the market was demanding is relevant to the extent that it

rebuts some obvious reasons why the PBM Defendants' behavior could not simply be common sense in declining to give preference to a low-cost product whose supply could not be scaled up to meet the market's demand. All these facts, once discovered, may create inferences for the factfinder about whether the PBM Defendants' intentions and conduct— when presented with Amneal's various strategies to achieve formulary placement— demonstrate the PBM Defendants' anticompetitive intentions and the racketeering actions that furthered them.

Thus, the Court finds that RFP Nos. 3–5 seek relevant information, with one exception: related entities of the PBM Defendants who are not current parties to the *In Re EpiPen* lawsuit cannot provide a factfinder with inferences about the named PBM Defendants' alleged intentional engagement in racketeering enterprises with anticompetitive goals; at best, they could provide insights about their own intentions and actions, but those are not relevant to the commercial bribery and antitrust claim elements that Plaintiffs need to prove. Thus, Amneal need not produce any materials relating to their strategies, actions (including proposed agreements, offers, and negotiations), and observations about entities who are not current parties to the *In re EpiPen* lawsuit. The Court proceeds next to whether Amneal can successfully rebut the relevance of the discovery that Plaintiffs seek, as limited by the Court's exclusion of unnamed PBM affiliates.

### B.    Amneal's Argument that the Discovery Sought is Irrelevant

Amneal argues that "Request No. 3 is patently irrelevant to this action" and, therefore, Plaintiffs fail to meet their burden to show the required threshold relevance to

support their RFPs and this Motion. (Resp't's Mem. Opp'n at 8, 10 (citing *Hofer*, 981 F.2d

at 380).) Amneal contends that its internal observations (or those of its predecessors) about

the PBMs during EAI product negotiations are wholly unrelated to Plaintiffs' claims in this

action. (*Id.* at 11.) To support this argument, Amneal primarily relies on an out-of-circuit

case, *Audio MPEG, Inc. v. HP Inc.*, No. 16-MC-80271 (HRL), 2017 WL 950847, at \*3

(N.D. Cal. Mar. 10, 2017).[4] (*Id.* at 11–13.)

In *Audio MPEG*, Dell, Inc. subpoenaed nonparty Apple, Inc., claiming that Apple

had entered into anticompetitive agreements with antitrust defendants in Dell's lawsuit,

and that "Apple's motivations in its communications and negotiations with Counter-

Defendants, and its understanding of those communications and negotiations, [were]

"central to Dell's antitrust counterclaims." *Id.* at \*4. The *Audio MPEG* court disagreed and

held that "[a] non-party's motivations and understanding of its relationship with a party

accused of monopolization has no bearing on any of [the elements of a monopolization

claim[,]]" which include "'possession of monopoly power in a relevant market, willful

acquisition or maintenance of that power in an exclusionary manner, and causal antitrust

injury.'" *Id.* (citing *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d

139, 147 (4th Cir. 1990)). Amneal argues that, as in *Audio MPEG*, Amneal's motivations

and its understanding of its relationship with the PBM Defendants are not relevant to the

PBM Defendants' alleged intent to gain an unlawful monopoly. (Resp't's Mem. Opp'n at

---

[4] Amneal also distinguishes this case from the caselaw that Plaintiffs claim supports their
request in RFP No. 3, claiming that the facts and parties here are nothing like those in the
caselaw the Plaintiffs provide. (Resp't's Mem. Opp'n at 13–15.)

11–12 (citing *Audio MPEG* at *3–4*).) Moreover, unlike Apple in *Audio MPEG*, Amneal argues that it had no competing agreement with the PBMs and so materials concerning Amneal's unsuccessful negotiations with the PBM Defendants "have even less relevance to the underlying litigation" than Apple's did. (*Id.* at 14.) The Court finds this argument unpersuasive. If the only nonparty materials relevant to an antitrust lawsuit are those obtained from nonparties who have managed to enter into an agreement with an antitrust defendant, that will cause some of the most relevant evidence in an antitrust action— evidence from nonparties who were eliminated from the market by an illegal monopolist— to be deemed, under Amneal's proposed rule of decision, irrelevant. Moreover, applying the *Audio MPEG* court's decision here would be to apply caselaw that is at once both too broad (addressing Sherman Act § 1 antitrust claims not present here) and too narrow (failing to address RICO claims present here) to directly translate to the instant case.

Amneal has not pointed to any binding Eighth Circuit or District of Minnesota case that persuades this Court that Plaintiffs' RFP Nos. 3–5 seek materials that are wholly irrelevant. Consequently, the Court will apply this District's law and give Rule 26 a broad reading of relevancy—a liberal reading of the Rule for which there is abundant in-Circuit caselaw. *See, e.g., Hofer*, 981 F.2d at 380 (citing *Kramer v. Boeing Co.*, 126 F.R.D. 690, 692 (D. Minn. Aug. 1, 1989) (collecting cases)). Thus, the Court finds that RFP No. 3 seeks materials that are relevant to the alleged anticompetitive intent and conduct of Mylan's monopoly—and the alleged racketeering actions of the PBM Defendants that facilitated it—and that Amneal has raised no convincing argument that such materials are, instead, irrelevant.

Next, in addition to arguing that RFP No. 3 is irrelevant, Amneal also claims that "Request Nos. 4 and 5 are largely irrelevant and unduly burdensome per se in their entirety because Plaintiffs should obtain negotiation materials from the party defendants, not Amneal." (Resp't's Mem. Opp'n at 8, 21.) To the extent that the information sought is in the PBM Defendants' possession, Amneal argues that it is unduly burdensome to seek it from a nonparty rather than a party. (*Id.* at 15.) At the motion hearing, Plaintiffs claimed that there are several reasons why the documents that they seek in RFP Nos. 4–5 cannot be obtained from the PBM Defendants in *In re EpiPen*. Plaintiffs contend that Amneal's internal email chains or draft proposals and agreements that might have begun with correspondence between Amneal and a PBM Defendant, but then branched off into internal conversations, may contain observations about the PBM Defendants' anticompetitive intent or conduct within the EAI market that are relevant.

The Court finds that the requests sought in RFP Nos. 4–5 are also relevant. The Court agrees that to capture Amneal's observations about its proposed agreements, offers, or negotiations with the PBM Defendants (themselves relevant evidence of what concrete actions Amneal and the PBM Defendants each took in relation to each other and the EAI market during the period of the alleged scheme), the internal communications within Amneal surrounding those dealings with the PBMs are also relevant, and are necessarily within Amneal's control rather than the PBM Defendants'. Thus, the Court finds that RFP Nos. 4–5 seek materials that are relevant to the alleged anticompetitive intent and conduct of Mylan's monopoly—and the alleged racketeering actions of the PBM Defendants whose

commercial bribery with Mylan facilitated it—and that Amneal has raised no convincing argument that such materials are, instead, irrelevant.

### C.   Amneal's Argument that the Discovery Sought is Disproportionate

Turning now to proportionality, Amneal argues that Request Nos. 3–5 seek materials that are disproportionate because the discovery sought is "overly broad and unduly burdensome." (Resp't's Mem. Opp'n at 9, 18.) At the motion hearing, Amneal repeatedly claimed that Plaintiffs' request is overbroad because Plaintiffs want every sales and manufacturing document that Amneal has. In its Memorandum, Amneal claims that the searches for every epinephrine-related document for a seven-year period[5] would present Amneal with great expense and inconvenience. (*Id.* at 8.) This is, in part, because data for Amneal's predecessors (*see supra* footnote 2) is archived in an "unstable and functionally unusable legacy SourceOne archival database" that has never been fully integrated into Amneal's current Proofpoint database and is effectively "not reasonably accessible[.]" (*Id.* at 8–9, 18–19 (citing Fed. R. Civ. P. 45(e)(1)(D)).) Amneal estimates that extracting the archival data "would likely take months and cost tens of thousands of dollars[,]" "hundreds of thousands of dollars" to process it to a readable state; uncertain costs to host those materials; and approximately $220K to search, review, and release the materials to Plaintiffs. (*Id.* at 9, 20.)

Amneal also argues that Plaintiffs' request is unfairly burdensome because it demands that Amneal produce commercially sensitive materials to its customers, a

---

[5] In their January letter to Amneal, Plaintiffs proposed that this period be further reduced to a six-year period. (Pls.' Jan. 21 Letter at 2.)

competitor, and negotiating partners—all without the protection of an Attorneys'-Eyes-Only tier within a protective order that has been crafted to reflect Amneal's interests as a nonparty in this action. (*Id.* at 9, 23–25.) According to Amneal, under the current Protective Order (*see* Protective Order, *In re EpiPen* (D. Minn. April 9, 2021), Dkt. No. 154), so long as Plaintiffs and Defendants agree, Amneal's sensitive information could be shown to various entities or experts—or disclosed at trial—and Amneal would have no legal footing to object to such harmful disclosures. (*Id.* at 9, 25–26.) Even with the existing Protective Order in place, Amneal contends that the fact that such (inadequate) protections exist for its productions is not a substitute for Plaintiffs' proof that there is substantial need for these competitively sensitive documents in the first place, which Amneal argues is wholly lacking here. (*Id.* at 26.)

Plaintiffs claim that Amneal's protestations about disproportionality fail because of the nature of the *In re EpiPen* case, Amneal's lack of proof concerning its alleged burdens, and the fact that Plaintiffs have already narrowed the scope of the RFPs in response to Amneal's objections. (Pls.' Mem. Supp. at 19–20.) Where, as here, the misconduct alleged is of great public importance, Plaintiffs argue that courts have found that it is permissible for nonparties to absorb the reasonable costs of responding to a subpoena. (*Id.* at 18–19 (citing *In re World Trade Ctr. Disaster Site Litig.*, No. 21-MC-100 (AKH), 2010 WL 3582921, at *2–3 (S.D.N.Y. Sept. 14, 2010); In re First Am. Corp., No. 8-M-85 (RWS), 184 F.R.D. 234, 242 (S.D.N.Y. 1998)).) Additionally, Plaintiffs contend that Amneal has not provided detailed support precisely showing the volume and personnel hours it estimates will be needed to produce the responsive materials, simply claiming it is *too*

much but not saying *how* much so that the Court can weigh those specific amounts. (*Id.* at 19 (citing *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-CIV-7488 (CM/JCF), 2017 WL 3822883, at *6 (S.D.N.Y. Aug. 30, 2017)).) Some of the documents that Plaintiffs seek are, according to Plaintiffs, documents that Amneal is required to carefully maintain for production to the Food and Drug Administration upon request, and thus, the materials should be readily available. (*Id.* at 7–8, 19–20.) Moreover, Plaintiffs argue that they have significantly reduced the already-targeted scope of RFP Nos. 3–5 to request only what is absolutely necessary, including reducing the relevant period for materials sought from seven years to six years. (*Id.* at 20; *see also* Pls.' Jan. 21 Letter at 2.)

As to Amneal's proportionality arguments based on confidentiality concerns, Plaintiffs claim that the existing Protective Order should be sufficient to allay Amneal's fears that the competitive risk of disclosing the requested discovery is too great. (*Id.* at 20.) First, the information sought is old, stale, and unlikely to harm Amneal's competitive advantage now. (*Id.*) Second, there are several tiers of confidentiality in the Protective Order, and Plaintiffs argue that Amneal's blanket protestations fail to address where it believes particular categories of requested productions would fall among those tiers, and why such a tier is inadequate. (*Id.* at 21.)

The Court finds that some of the information that Plaintiffs seek in RFP. Nos. 3–5 is not only relevant, but is proportionally necessary to fill in key gaps in the facts. Plaintiffs believe Amneal's documents may contain observations about the PBM Defendants' intent and conduct during the period of the alleged antitrust/commercial bribery scheme— observations that few entities would be able to capture because the number of product

competitors in the EAI market has been so small. If Plaintiffs' allegations are true, then Amneal has sustained antitrust injuries because of Defendants' antitrust and commercial bribery scheme; but this does not exempt Amneal from bearing the reasonable burden that subpoenas regularly place upon nonparties to provide relevant and proportional discovery in line with Rule 26. The Court has found some of Plaintiffs' requests in RFP Nos. 3–5 relevant and has carefully weighed the parties' proportionality arguments above. Before reaching a holding on proportionality, the Court will consider the special proportionality considerations governed by Rule 45 in which a party requests discovery from a nonparty.

### D.    The Sufficiency of Plaintiffs' Steps Taken to Avoid Undue Burden on a Nonparty Under Rule 45

Plaintiffs argue that it has repeatedly compromised with Amneal and attempted to narrow its already targeted requests and eliminate additional alleged undue burdens, but Amneal has refused to produce more than "four publicly available documents" and "66 largely irrelevant documents." (Pls.' Mem. Supp. at 5, 11–12.) At the motion hearing, Plaintiffs explained that they had to hunt down the contact information to even get those 66 documents produced, so the effort that Amneal had to expend to produce them was minimal because of Plaintiffs' efforts. At the hearing, Plaintiffs also claimed that Amneal has been unwilling to engage in collaborative efforts to find workable compromises.

Amneal argues that "Plaintiffs have made basically no effort 'to avoid imposing undue burden or expense on' Amneal." (Resp't's Mem. Opp'n at 3 (quoting Fed. R. Civ. P. 45(d)(1)), 22, 26, 30.) It claims that there are concrete ways in which Plaintiffs could have done so. (*Id.* at 3, 22–23.) For example, Plaintiffs could have used Amneal's

organizational charts to reasonably limit the custodians whose materials will be run against relevant search terms. (*Id.* at 3, 22.) Likewise, according to Amneal, Plaintiffs have not cabined their searches for epinephrine-related materials within practical parameters so that a responsive search is not "every, or nearly every, epinephrine-related document in Amneal's possession for a period spanning nearly seven years." (*Id.* at 3, 21–23.) Amneal also claimed at the motion hearing that, because Plaintiffs failed to provide any narrowing of their requests, Amneal ran a broad search yielding about 156,000 hits at great expense to itself. (*Id.* at 23 (citation omitted), 26.)

At the motion hearing, Plaintiffs responded that they did not ask Amneal to run this search against these custodians. Instead, Plaintiffs claimed that Amneal incurred these costs all on its own using parameters it made up and that, as a result, the information located may be irrelevant. Plaintiffs claim that it is unfair for Amneal to self-impose an expensive search, then allege that Plaintiffs are making them bear an undue burden. Plaintiffs also argued at the motion hearing that Amneal exaggerates the breadth of what Plaintiffs are seeking when, in fact, what Plaintiffs want are limited documents (not all of the hits that Amneal received from its self-imposed search) resulting from a more tailored search of materials from, most likely, four or five custodians and, at most, eight. Plaintiffs also claimed that in their January letter they requested their search be run against the custodial materials of individuals with specifically-identified names and/or job titles, so it is untrue that Plaintiffs have given no guidance to Amneal on custodial searches. Amneal, in turn, claimed at the motion hearing that this simply is not true because Plaintiffs refuse to limit

their request to particular custodians on Amneal's organizational charts, or to specific search terms to run against those select custodians.

The Court finds that, even considering that Amneal is a nonparty under Rule 45 and that Plaintiffs and this Court must protect Amneal from undue burden and expense, some productions in response to RFP Nos. 3–5 are not only relevant, but proportional. Rule 45 requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena [,]" and "[t]he court for the district where compliance is required must enforce this duty . . . ." Fed. R. Civ. P. 45(d)(1). The Court has carefully considered Amneal's arguments and finds some of Amneal's arguments on proportionality persuasive, but others unpersuasive. On its claims that Plaintiffs seek every document that Amneal has, the Court is unconvinced. Amneal is a sophisticated company with more generic therapeutic products than only Adrenaclick, and the Court finds that Amneal exaggerates its burden by claiming Plaintiffs want everything; Plaintiffs want a subset of the documents that Amneal possesses related to an originally seven-year, now narrowed to a six-year period, spanning January 1, 2013 through December 21, 2018, limited to EAI devices. (*See* Pls. Jan. 21 Letter at 2.) This is hardly every document in Amneal's possession, and Amneal will need to produce some relevant materials that are proportional.

As to Amneal's productions to date that Amneal claims have already unfairly overburdened it, the Court finds this is not so. Amneal has produced four public documents with ease, 66 documents with Plaintiffs' assistance, and—without being asked—has run a self-imposed document search yielding over 156,000 hits based on its own selection of

custodians and its own search terms. The Court finds that Amneal's burdens have been minimal as to the first two, and as to the third, the Court finds that Amneal has created its own burden and cannot now claim that its burden is already too great based on this search. Furthermore, the correspondence that the Court ordered be produced after the motion hearing tellingly shows that Plaintiffs did not direct Amneal to conduct that search, was not aware of its parameters, and "believe[d] it would be far more efficient and less burdensome to first agree on a new search string that yields a lower hit count as drawn from a limited number of relevant custodians." (Pls.' Jan. 21 Letter at 2.) For RFP Nos. 4–5, Plaintiffs then go on to offer a limited search string of five words, a more restricted relevant period starting point of January 1, 2013 (rather than March of 2012), and a list of four custodians identified by name or by role. (*Id.* at 2–3.) And even then, Plaintiffs did not request that every hit be produced; they asked Amneal to share the hit counts so that the parties could further tailor the searches as needed to be proportional. (*Id.* at 3.) Plaintiffs provide similar limitations and guidance for RFP No. 3. (*Id.*) Plaintiffs' actions hardly amount to the fishing expedition that Amneal claims, and Amneal's burdens to date, while real, are not primarily Plaintiffs' doing. Thus, Amneal's initial search does not render its future productions disproportionate.

As to the costs of searching archived documents from Amneal's predecessors, the burden of producing these documents is significant because of how these archived documents are stored. For such documents, the Court agrees with Amneal that it is appropriate to shift some of the costs to recover these materials in readable and searchable form to Plaintiffs. Therefore, Amneal will produce a detailed invoice setting forth the

precise estimates for the costs it anticipates in producing the relevant materials, as limited by this Order. The Court finds that it is reasonable for Plaintiffs to bear 80% of those costs, but that it is also reasonable for Amneal to take no actions unless and until Plaintiffs give their clear written consent for Amneal to proceed in incurring those costs.

As to Amneal's concern for the risk it takes in producing these commercially sensitive materials to customers, a competitor, and negotiating partners, the Court agrees that the existing Protective Order does not adequately safeguard Amneal's productions. However, it also agrees with Plaintiffs that stale information does not jeopardize Amneal's competitive abilities to the same degree as current information. Therefore, the parties in this action only (Plaintiffs and Amneal) shall meet-and-confer on this issue and shall agree upon a protective order that includes a "Highly-Confidential - Attorneys'-Eyes-Only" tier with protections for Amneal's productions from 2017 and 2018 that may jeopardize Amneal's competitive abilities (for an example, *see* Protective Order ¶ 4.B., *In re EpiPen*). Amneal and Plaintiffs shall also work to specify under what safeguards any entity other than attorneys (i.e., experts, vendors, etc.) shall be able to view these AEO-designated materials. For responsive materials for the years preceding 2017, the parties shall also include a "Confidential" tier of protections for Amneal's productions (for an example, *see id.* ¶ 4.A.). The parties and Amneal shall jointly file the proposed protective order **on or before May 30, 2021**. Thus, with these amendments, the currently inadequate Protective Order in *In re EpiPen* also does not pose an obstacle to Amneal's proportional production of relevant responsive materials.

For those materials that the Court has found relevant—which includes everything listed in RFP Nos. 3–5 as limited to Amneal's (and its predecessors') negotiations over Amneal's EAI products with the named PBM Defendants <u>only</u> during the six-year period at issue—the Court also finds that the Rule 26(b) factors favor Amneal's production of these materials because the information is proportional to the needs of the *In re EpiPen* case. Amneal's observations about the PBM Defendants' intentions and actions during the period of the alleged commercial bribery/antitrust scheme are of importance to the issues at stake in this action and to their resolution. The amount in controversy in this case is significant, and the public interest involved in access to fair market prices for medical devices is great. As to the parties' relative access to relevant information, the Court finds that some of the materials that Plaintiffs seek in RFP Nos. 4–5 relating to the PBM Defendants' proposed agreements, offers, or negotiations, are within the control of the PBM Defendants. To the extent that they are, Plaintiffs shall seek those materials from the PBM Defendants for documentation on their side of such interactions. However, as the Court has detailed above in this Order, some aspects of RFP Nos. 4–5 sit only within the custody of Amneal, and it is proportional to the needs of this case that it shall produce those materials for which only it has access.[6] As to resources, both parties are well-resourced, sophisticated entities. The Court has also allocated 80% of the costliest part of this

---

[6] In making its proportionality-related argument that Plaintiffs should seek materials equally available from Amneal or the PBM Defendants from the PBM Defendants as parties to the *In re EpiPen* lawsuit, Amneal did not provide the Court with a list specifying which materials should be obtained from Amneal and which from the PBM Defendants. Plaintiffs and Amneal must meet-and-confer as to which source particular materials should be obtained from.

discovery's burden to Plaintiffs, further mitigating the nature of that burden for Amneal. Considering all of these factors, the Court finds that the burden or expense of the proposed discovery does not outweigh its likely benefit, and that responsive productions to RFP Nos. 3–5, as modified for relevance and proportionality by this Order pursuant to Rules 26(b) and 45(d)(1), should be made by Amneal.

Additionally, the Court finds that in their January letter Plaintiffs proposed adequately narrowed parameters for the requested searches for RFP Nos. 3–5—including a limited period of six years spanning January 1, 2013 through December 21, 2018, and limited custodians and search terms—along with instructions to Amneal to provide the hit count so that the searches may be further narrowed. Amneal shall proceed according to the reasonable plan that Plaintiffs propose, and in compliance with this Order. Non-archived responsive materials that fall within the relevant and proportional limitations set by this Order shall be produced **on or before June 20, 2022**. Archived responsive materials that fall within the relevant and proportional limitations set by this Order shall be produced **on or before July 20, 2022**.

### E.    Amneal's Request for Cost-Shifting for Ordered Productions

Amneal claims that Plaintiffs' burdensome requests justify a court order shifting all future production-related costs onto Plaintiffs, rather than forcing it to rely on Plaintiffs' promise "that they 'will gladly consider reimbursement of a portion of Amneal's costs.'" (Resp't's Mem. Opp'n at 12, 27 (citations omitted).) Amneal claims that, because it will be put to considerable expense if any production is ordered, the Court must protect Amneal from unfairly shouldering the costs of their compliance, particularly where Plaintiffs'

requests are so broad. (*Id.* at 27 (citing Fed R. Civ. P. 45(d)(2)(B)(i)–(ii)), 28.) This is particularly true here, argues Amneal, where "in Plaintiffs' view, Amneal is a victim of Defendants' alleged scheme" and should not be harmed even more by Defendants' actions through the costs of production for this Subpoena. (*Id.* at 27–28.) Amneal also claims that the Court should, through this Order, remind antitrust plaintiffs (and in particular, the instant Plaintiffs), that issuing unduly broad subpoenas to nonparties is not an appropriate litigation strategy under the Federal Rules of Civil Procedure. (*Id.* at 29 (citing Fed. R. Civ. P. 45(d)(1)).)

As stated above, the Court holds that Plaintiffs shall cover 80% of the costs to recover relevant and proportional materials contained in a storage system predating Amneal's current data storage system. This cost-shifting shall include all aspects of that data's production to Plaintiffs. For the responsive materials that are within Amneal's current data storage system, the burden and expense are not as great, and Plaintiffs shall bear 20% of the costs of producing those materials that they authorize Amneal to produce. Amneal is cautioned, however, based on its previous, costly, self-imposed search, that Plaintiffs shall not be required to bear any portion of the cost of productions for which they have not specifically asked.

## F.   Amneal's Request for an Award of Attorneys' Fees and Costs

Amneal contends that, because Plaintiffs have failed to take steps to avoid overburdening it, sanctions covering its costs and fees to date related to Plaintiffs' Subpoena and the instant Motion to Compel are appropriate. (*Id.* at 10, 30.) Finding that Plaintiffs have sufficiently demonstrated their steps undertaken to avoid overburdening

Amneal, and that Amneal has self-imposed a large part of its costs and burdens, the Court declines to award Amneal any past costs or attorneys' fees for its responses to this Subpoena, or for its defense against this Motion to Compel.

## IV.     CONCLUSION

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs Rochester Drug Co-Operative and Dakota Drug, Inc.'s Motion to Compel Nonparty Amneal Pharmaceuticals LLC to Produce Documents Responsive to a Rule 45 Subpoena (Dkt. No. 1.) is **GRANTED** in part and **DENIED** in part, as set forth above.

Date: May 20, 2022                              *s/ John F. Docherty*

                                        JOHN F. DOCHERTY
                                        United States Magistrate Judge